**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Oct 27 2014, 10:09 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEYS FOR APPELLANT:

**JEREMY K. NIX**
**CASEY C. MORGAN**
Matheny, Hahn, Denman & Nix, L.L.P.
Huntington, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**JODI KATHRYN STEIN**
Deputy Attorney General
**KAITLYN FOCKEN**
Certified Legal Intern
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| PEPPER M. GLISSON, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 35A04-1403-CR-145 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE HUNTINGTON SUPERIOR COURT
The Honorable Jeffrey R. Heffelfinger, Judge
Cause No. 35D01-1306-FD-130

**October 27, 2014**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**KIRSCH, Judge**

Pepper M. Glisson ("Glisson") appeals her convictions,[1] after a jury trial, for perjury,[2] a Class D felony, and obstruction of justice,[3] a Class D felony. On appeal, she raises the following restated issue: whether sufficient evidence was presented to support her convictions.

We affirm.

## FACTS AND PROCEDURAL HISTORY

On September 11, 2012, Glisson found the packaging for a vibrator in the living room of her house, along with a receipt dated September 7, 2012. Glisson eventually found the vibrator in the bedroom of her teenage daughter, J.G. Glisson called her husband, Jason Glisson ("Jason"), who was J.G.'s stepfather, and asked him if he bought something he should tell Glisson about. Jason said, "I gave it to her," and Glisson got very angry. *State's Ex.* 1. After finding the vibrator, Glisson called her neighbor, Kathy Wintrode, and told her that Jason had bought J.G. a vibrator. Glisson also contacted one of her close friends, Robert Ferguson, because she was mad and wanted to talk. Glisson told Ferguson that Jason had purchased the sex toy for J.G. and gave it to her. Ferguson reported the information to a friend he knew was obligated to report such occurrences due to the friend's job.

---

[1] We note that the General Assembly enacted a new version of the criminal statutes at issue, which became effective July 1, 2014. Because Glisson committed her crimes in January 2013, we apply the statutes in effect at the time she committed her crimes.

[2] *See* Ind. Code § 35-44.1-2.1.

[3] *See* Ind. Code § 35-44.1-2-2(a)(1)(A).

On September 14, 2012, John Lane, a family case manager with the Indiana Department of Child Services ("DCS"), conducted separate interviews, first with Glisson, and then with J.G., at McKenzie's Hope, a child advocacy center in Huntington, Indiana. Glisson was initially very supportive of J.G. and cooperative with the authorities. At the initial interview, when asked to describe what occurred, Glisson told the authorities that, after she discovered the vibrator, she spoke with Jason, and he told her he had purchased it for J.G. On the date of the initial interview, Glisson was very angry with Jason and planned to have him move out. After interviewing Glisson, Lane spoke with J.G. alone, and J.G. stated that Jason bought her a vibrator and gave it to her three or four days earlier. At the conclusion of the interview, the police went to Glisson's residence and collected evidence given to them by Glisson, which included the black bag with packaging for the vibrator and the receipt and the vibrator itself.

Lane met with Glisson two or three more times following the September 2012 interview, and her position started to "waiver." *Tr.* at 119. Glisson began having ongoing contact with Jason, allowing him in her house, and became very unsupportive of J.G. In November 2012, J.G. attempted to harm herself and was admitted into Michiana Behavioral Health ("MBH") as an inpatient from November 1 to November 13, 2012. Glisson never visited J.G. while she was in MBH because "the schedule never matched up" and she worked during visitation hours. *Id.* at 325. Glisson testified at trial that she "still believed [J.G.] at that point," during J.G.'s stay at MBH. *Id.* at 326. However, J.G.'s intake form for MBH stated, under presenting problem, "attempted suicide – overdose on Zoloft, cutting – last on Monday, *lying to the extreme – legal case now because of it.*"

*State's Ex*. 6 at 14.  Additionally, Jessica Castronovo, a therapist at MBH who worked with J.G., wrote in her notes on November 5, 2012 that, "Mom denies that stepdad has done anything wrong or inappropriate." *State's Ex*. 6B.  Glisson filled out a form that authorized people to get information on or speak with patients in MBH and authorized Jason and his attorney as such persons.

While staying at MBH, J.G. disclosed that Jason had conducted strip searches on her, and Castronovo reported the allegations to DCS.  Castronovo talked to Glisson about the allegations, and Glisson confirmed that Jason conducted strip searches on J.G.  Glisson also told her neighbor, Wintrode, that Jason conducted strip searches on J.G.  Glisson said that initially she conducted the strip searches, but when she became unable to continue due to work, Jason started conducting them.  Castronovo was even more concerned when Glisson offered for J.G.'s brother to be a witness during the strip searches performed by Jason and told Glisson that would not be appropriate.

Castronovo also talked to Glisson about the allegations that Jason had purchased J.G. a vibrator, and Glisson confirmed that Jason had bought it for J.G. and gave it to her because he had caught her masturbating.  After J.G. was released from MBH, Glisson was not supportive of J.G.'s allegations against Jason.  Glisson told J.G. that J.G. should believe that Jason did nothing wrong and that if J.G. "stuck with [her] story that Jason would go to jail and he would be killed by the inmates" because he was a reserve police officer.  *Tr*. at 247.  Glisson would also no longer allow anyone to interview J.G. alone or without a court order.

On December 11, 2012, Glisson was interviewed at the police department, as was J.G., but Glisson insisted on being in the room during the interview. Glisson's attitude was "completely opposite" from what it was in the September 2012 interview. *Id*. at 138. During the interview, she still remembered Jason saying he gave the vibrator to J.G., but she denied that Jason had ever strip searched J.G. J.G. intentionally lied during the interview and said that Jason never strip searched her. She later testified that she did so because she was afraid that something would happen to her or Jason if she told the truth because of her conversations with Glisson. *Id*. at 250.

Glisson and J.G. were both deposed on January 3, 2013. Glisson told J.G. before the deposition that if J.G. was asked about "those things," she should say she did not remember because of her medications. *Id*. at 253. Glisson told J.G. that Glisson would say she "did not remember" if asked a question she did not want to answer during her deposition. *Id*. Glisson was present for J.G.'s deposition, and when asked about whether Jason had bought her a vibrator, she answered that she did not remember and blamed her lack of memory on her medications. *Id*. at 252.

During Glisson's deposition, the State asked, "Did he say to you on the phone 'I [g]ave it to her'?" *Id*. at 181. Glisson responded, "He may have. I don't recall." *Id*. at 182. Glisson was also asked, "Did you talk to him about the decision that the vibrator would be for her, did you talk to him?" *Id*. Glisson responded, "No," and she blamed her lack of memory on "emotional memory issues." *Id*. at 182-83. Glisson was also asked if she had ever told anyone that Jason had performed strip searches on J.G., and she stated she did not remember. She was specifically asked if she had told anyone at MBH about

5

the strip searches, and she again responded that she did not remember. Glisson also stated that, although J.G. was subject to strip searches, Glisson was the one who conducted them and not Jason. After the January 3 deposition, the police recommended a charge of perjury against Glisson.

In August 2013, DCS case manager Bobbi Lamb received an investigation regarding J.G. and sexual and physical abuse allegations. Lamb interviewed J.G. twice, once in August 2013 and again in September 2013 without Glisson present. J.G. told Lamb that she did not want to remember what happened during the January 3, 2013 deposition because she lied. *Id*. at 272. J.G. said that Glisson was not physically abusive to her, but was mentally abusive regarding J.G.'s story of what happened with Jason. *Id*. Lamb also spoke with Glisson. Glisson told Lamb that Jason had given J.G. a vibrator and that she had gotten in a fight with Jason about it. Glisson claimed to be the only one who ever strip searched J.G. and stated that Jason never did. *Id*. at 307. Glisson alleged that she had been told by another DCS case manager to do the strip searches on J.G., but that case manager stated she had never told Glisson to do any kind of strip searches on J.G. *Id*. at 207-09, 307. After Lamb's interviews with Glisson, the police referred additional charges against her for perjury and obstruction of justice.

On June 25, 2013, the State charged Glisson with Class D felony perjury. On November 11, 2013, the State amended the information and charged Glisson with an additional count of Class D felony perjury and a count of Class D felony obstruction of justice. A jury trial was held, and the jury found Glisson guilty as charged of two counts of perjury and one count of obstruction of justice. For sentencing purposes, the trial court

6

merged the perjury convictions and sentenced Glisson to an aggregate one and a half years executed. Glisson now appeals.

## DISCUSSION AND DECISION

On appeal, Glisson argues that the State did not provide sufficient evidence to convict her of perjury and obstruction of justice. When reviewing the sufficiency of the evidence needed to support a criminal conviction, we consider only the evidence supporting the judgment and any reasonable inferences that can be drawn from such evidence. *Newell v. State*, 7 N.E.3d 367, 369 (Ind. Ct. App. 2014), *trans. denied.* "It is the fact-finder's role, and not ours, to assess witness credibility and weigh the evidence to determine whether it is sufficient to support a conviction." *Drane v. State,* 867 N.E.2d 144, 146 (Ind. 2007). We affirm a conviction unless no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt. *Id.* It is therefore not necessary that the evidence overcome every reasonable hypothesis of innocence; rather, the evidence is sufficient if an inference reasonably may be drawn from it to support the trial court's decision. *Id.* at 147. It is well established that circumstantial evidence will be deemed sufficient if inferences may reasonably be drawn that enable the trier of fact to find the defendant guilty beyond a reasonable doubt. *Pratt v. State,* 744 N.E.2d 434, 437 (Ind. 2001). As this was a bench trial, we presume the judge knows and will follow the applicable law. *Leggs v. State*, 966 N.E.2d 204, 208 (Ind. Ct. App. 2012).

Glisson first argues that the State failed to present sufficient evidence to support her convictions for perjury. In order to convict Glisson of perjury, the State was required to prove that she made a false, material statement under oath or affirmation, knowing the

7

statement to be false or not believing it to be true. Ind. Code § 35-44.1-2-1(a)(1). It is well-settled that confusion or inconsistency alone is not enough to prove perjury. *Daniels v. State,* 658 N.E.2d 121, 123 (Ind. Ct. App. 1995).

The first false statement that the State alleged Glisson made was her statement during the deposition on January 3, 2013, that she did not remember a prior conversation where Jason told her he gave the vibrator to J.G. Glisson argues that her original statement in September 2012 was "highly emotional," and the reason why her statement under oath at the deposition was different was because she could not remember what she said during the prior emotional time. *Appellant's Br.* at 8. However, the evidence favorable to the verdict showed that, in September 2012, Glisson told the authorities, her neighbor, Wintrode, and her friend, Ferguson, that Jason had told her he bought the vibrator for J.G. Her original statements made during the interview with DCS and the police at McKenzie's Hope were recorded and reproduced at trial. Additionally, in December 2012, less than a month before the January deposition, Glisson still said that Jason had told her he gave the vibrator to J.G. But at the January 3, 2013 deposition, Glisson was not cooperative and stated she no longer remembered what Jason said to her or whether she even had a conversation with him. When Glisson was asked specifically whether she had a conversation with Jason about "the decision that the vibrator would be for [J.G.]," she responded "no." *Tr.* at 182. This contradicted all of her previous statements. The State presented sufficient evidence to support Glisson's conviction for perjury.

The second statement that the State alleged that Glisson made was her statement during the January 3 deposition that Jason did not perform strip searches on J.G. and that

8

she did not remember telling anyone that he had done so. Glisson contends that her deposition statements were susceptible to more than one interpretation and did not constitute perjury. The evidence presented showed that, prior to the January 3 deposition, Glisson repeatedly stated that Jason performed strip searches on J.G., but then, at the deposition, denied that the strip searches had been performed by Jason. When she spoke with Castronovo, Glisson confirmed that Jason had performed strip searches on J.G. when Glisson had to work and even offered for J.G.'s brother to be present during the strip searches. Glisson also told her neighbor, Wintrode, that Jason performed strip searches on J.G. Sufficient evidence was presented to support Glisson's conviction for perjury.

Glisson next argues that the State failed to present sufficient evidence to support her conviction for obstruction of justice. In order to convict Glisson of obstruction of justice, the State was required to prove that she knowingly or intentionally induced, by threat, coercion, or false statement, a witness in an official proceeding or investigation to withhold or unreasonably delay in producing any testimony or information. Ind. Code § 35-44.1-2-2(a)(1)(A). "'The State is not required to prove actual impairment of the investigation. Mere potential influence with a line of inquiry is sufficient to establish materiality.'" *Roush v. State*, 875 N.E.2d 801, 810 (Ind. Ct. App. 2007) (quoting *Vandivier v. State*, 822 N.E.2d 1047, 1054 n.6 (Ind. Ct. App. 2005) (citations omitted), *trans. denied*). In the context of obstruction of justice, coercion is defined as some form of pressure or influence exerted on the will or choice of another. *Brown v. State*, 859 N.E.2d 1269, 1271 (Ind. Ct. App. 2007), *trans. denied*. Forms of pressure or influence include, but are not limited to, intimidation, physical force, threats, and harassment. *Id.* Whatever the form of pressure or influence,

there should be a consequence for failure to comply; otherwise the statement is not coercive, but is merely a request. *Id.*

The evidence presented at trial showed that, prior to the January 3, 2013 deposition, Glisson told J.G. to say she did not remember "because of her medications" when asked about what occurred regarding the vibrator. *Tr*. at 252-53. Glisson told J.G. to "tell the truth," which J.G. knew meant to tell Glisson's version of the events and not what really occurred with Jason. *Id*. at 272. Glisson also told J.G. that she should believe that Jason did nothing wrong because if J.G. "stuck with [her] story that Jason would go to jail and he would be killed by the inmates" because he was a reserve police officer. *Id*. at 247. This statement was a consequence for failure to comply, making Glisson's statement coercive and not merely a request. Glisson's statement's to J.G. was coercion to induce J.G. to withhold information, what actually happened, when she testified at the deposition. The State presented sufficient evidence to prove that Glisson committed obstruction of justice. We conclude that sufficient evidence was presented to support Glisson's convictions for perjury and obstruction of justice.

Affirmed.

BAKER, J., and ROBB, J., concur.